**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **LIBERMAN MEDIA GROUP, LLC**<br><br>**Plaintiff**<br><br>**v.**<br><br>**WINTER HORTON**<br><br>**Defendant** | **CIVIL NO.  3:26-CV-01125-SCC**<br><br>**BREACH OF CONTRACT** |

**DECLARATION OF WINTER HORTON IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY ACTION, OR IN THE ALTERNATIVE, TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) FOR LACK OF
SUBJECT MATTER JURISDICTION**

I, Winter Horton, declare as follows:

1.       I am over 18 years of age.  I am the named defendant in this action.  I make this declaration in support of DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY ACTION, OR IN THE ALTERNATIVE, TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) FOR LACK OF SUBJECT MATTER JURISDICTION.  If called upon to do so, I could and would testify before the Court in person under oath under penalty of perjury to the facts as I declare them herein.

2.       I have read the Complaint in this action and am familiar with its contents.

3.       I was born in Connecticut in 1965.  I moved with my family to California in 1970.  California was continuously my permanent residence thereafter, until August of 2024.  In August of 2024, I moved to Rhode Island, with the intention of residing there

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

permanently. I have resided in Rhode Island continuously since August 2024, with no intention of making any other state my home.

4. I am currently, and since at least 1997 have been, a business professional with experience in the broadcast industry, including the management and operation of broadcast television and radio stations.

5. By 1997, I had met Lenard Liberman. Between 1997 and 2019 (and afterward, including for me until August 2024), Mr. Liberman and I both had our permanent home residences in Los Angeles County, California. During that time, I personally visited Mr. Liberman's Los Angeles County, California residence at least several times. Between 1997 and 2019, Mr. Liberman and I worked together in the management and operation of multiple broadcast television and radio stations. Over that approximately twenty-two-year span, I served as the Chief Operating Officer, or "COO," of multiple broadcast television stations and radio stations owned by Mr. Liberman, or by business entities substantially owned and controlled by Mr. Liberman.

6. In 2020, Mr. Liberman and I each independently learned of an opportunity to purchase a broadcast television station in Puerto Rico which was then owned and operated by, and contractually affiliated with, Univision. This was the station which the Complaint references at its paragraph 5 as now being owned by the plaintiff in this action. The plaintiff in this action is Liberman Media Group, LLC, which I refer to herein as "LMG."

7. Univision is a well-known broadcast television network. It is a dominant player in the Spanish-language television broadcasting market in the United States of America. In assessing the opportunity to purchase the Puerto Rico television station, I and Mr.

2

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

Liberman both believed that Univision was also at least as dominant in territories of the United States of America, including Puerto Rico, as Univision was in the continental United States.  Mr. Liberman told me at the time that he believed this, as did I.

8.    After some discussion together, Mr. Liberman and I agreed that the Puerto Rico television station opportunity was valuable and that we should pursue it together.  As Mr. Liberman told me himself, he caused LMG to be formed in or about July 2020, for the purpose of purchasing and operating the Puerto Rico television station, and to act as a business entity for the two of us to run the Puerto Rico television station together.  However, under the initial operating agreement of LMG, I was not named as a member of LMG.

9.    I was involved in the negotiations to purchase the station from Univision.  As of the summer and fall of 2020 timeframe, LMG had not yet successfully purchased the station.  LMG's purchase of the station did not become effective until January 1, 2021.

10.    On November 2, 2020, I signed a written agreement presented to me by Mr. Liberman, and which he told me that he caused to have drafted and over which he controlled the drafting.  The agreement was a "Services Agreement" between myself, on the one hand, and LMG, on the other hand.  A true and correct copy of the Services Agreement, including the Exhibits A, B, and C which were and are part of the Services Agreement, is attached to my declaration as **Exhibit 1**.   My signature appears on page 9 of Exhibit 1, the signature page of the main body of the Services Agreement.  I am familiar with Mr. Liberman's signature.  Mr. Liberman's signature also appears on page 9 of Exhibit 1, in the signature block for LMG.  The purpose and intent of the Services Agreement, as Mr.

3

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

Liberman and I discussed it together, was to establish and govern my employment with LMG as its COO, once LMG's purchase of the station was fully consummated, if it was (which, as things happened, it was).

11. As shown on Exhibit 1, paragraph 9 of the main body of the Services Agreement (Exhibit 1 at page 5) is headed "Arbitration" and references and incorporates Exhibit C to the Services Agreement. Exhibit C to the Services Agreement is a document entitled "AGREEMENT TO ARBITRATE DISPUTES" (which document I refer to hereinafter as the "Arbitration Agreement"). The Services Agreement's Exhibit C "Arbitration Agreement" appears at pages 37 to 38 of Exhibit 1. I signed Exhibit C on or about November 2, 2020, and so did Mr. Liberman on behalf of LMG. My signature appears on the signature page of Exhibit C (page 38 of Exhibit 1) and so does Mr. Liberman's (in the signature block for LMG). I consider the Exhibit C "Arbitration Agreement" to be part of the Services Agreement, just as the Services Agreement on its face says that it is.

12. When it seemed substantially certain that LMG was going to consummate purchase of the Puerto Rico station, Mr. Liberman presented me with a second written agreement, which Mr. Liberman also told me that he had caused to be drafted and over which he controlled the drafting. This one was titled "Amended and Restated Limited Liability Company Agreement of Liberman Media Group LLC A Puerto Rican Limited Liability Company," and was intended to be effective as of January 1, 2021. Consistent with the terminology used in the Complaint, I call this agreement for short here the "Amended LLC Agreement." A true and correct copy of the Amended LLC Agreement is attached hereto as **Exhibit 2**. LMG and Mr. Liberman and I all entered into the Amended LLC

4

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

Agreement with each other, effective as of January 1, 2021. The Complaint says that we actually signed the Amended LLC Agreement also on November 2, 2020 (the same day as signing the Services Agreement), which I do not necessarily dispute. Mr. Liberman's signature appears twice on page 51 of Exhibit 2 – once in the signature block for LMG at its Manager, and once for himself as an individual and "Class A Member" of LMG. My signature appears on page 54 of Exhibit 2, on a page of the Amended LLC Agreement called "Adoption Agreement." Mr. Liberman's signature (on behalf of LMG) also appears again on that same "Adoption Agreement" page (page 54 of Exhibit 2).

13.     The purpose and intent of the Amended LLC Agreement, as Mr. Liberman and I discussed it together, was to make me a part owner of LMG over time, by providing me with "Class B" (financially participating, but non-voting) membership interests in LMG, as part of the consideration for my providing services to LMG as its COO. In other words, my becoming a party to the Amended LLC Agreement was part of my financial compensation package for agreeing to render COO services to LMG. My "Class B" units in LMG were to vest over time pursuant to a schedule, as I continued to perform as LMG's COO. The vesting arrangement and schedule are set forth in an exhibit or attachment to the Amended LLC Agreement entitled "Liberman Media Group LLC Profits Interest Agreement" (pages 56-68 of Exhibit 2).

14.     From January 1, 2021 forward, I did in fact serve as LMG's COO and I did in fact earn "Class B" units, and, as Mr. Liberman acknowledged to me many times, I did in fact become a "Class B" member of LMG as part of my financial compensation for agreeing to serve as, and actually serving as, LMG's COO.

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

15.     I thus had two distinct relationships with LMG.

16.     In my primary relationship with LMG, and through which the other relationship derived, I was employed by LMG as its COO.  That COO employment relationship was governed by and subject to the Services Agreement, including the Arbitration Agreement in it (Exhibit 1, with the Arbitration Agreement specifically at pages 37-38 of Exhibit 1).  Until Mr. Liberman stripped me of most or all of my substantive duties as COO (as I discuss further below), I had significant actual management responsibilities for LMG, but those responsibilities were all in my role as LMG's COO, and all subject to my rights as set forth in the Services Agreement, and to reporting to Mr. Liberman as LMG's Chief Executive Officer or "CEO."

17.     As a second and different relationship with LMG, I was – and I still am – a "Class B" member of LMG, a relationship governed at least in part by the Amended LLC Agreement (Exhibit 2).  However, in my Class B member status, I had and have no management rights or responsibilities with or to LMG, at the very least not as to any of the conduct or types of issues alleged in the Complaint.  In my Class B member relationship with LMG, I was and am akin to a limited partner in LMG: in that Class B membership role, I had and have a passive financial interest, but no management rights or responsibilities. In that Class B membership role with LMG, I do not have and I never had any power or authority to take any action on LMG's behalf, at least not relevant to any issues raised in the Complaint.  The only way I could act for LMG, at least with respect to the types of issues raised by the Complaint, was in my role as LMG's COO.

6

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

18.     LMG successfully acquired the Puerto Rico station as of late December 2020 or so.  Between no later than about January 1, 2021 and through approximately April 2025, the Puerto Rico station was operated with Liberman serving as LMG's CEO (and controlling principal) and me serving as LMG's COO (and I also became over time a non-managing principal, akin to a limited partner).  Other individuals served in other roles with LMG and helped operate the station, too.  Until I moved to Rhode Island in August 2024, Mr. Liberman and I both continued to reside in Los Angeles, California.  We conducted much of the station's business remotely from Los Angeles, with each of us making regular in-person trips to Puerto Rico to manage station business.  The reason I moved to Rhode Island was to have a shorter commute to Puerto Rico.

19.     Over time, Mr. Liberman and I came to understand and believe together (as Mr. Liberman discussed with me on occasion) that the Univision brand and much of Univision's network content was not as dominant or attractive to the Spanish-speaking population in Puerto Rico as it was in the rest of the United States.  Nonetheless, the Univision relationship continued to be important to LMG's business, including because, in addition to being a contracted content provider to the station, Univision was also the station's landlord.  Univision owned the building that served as the station's headquarters, and title to the building was not part of what LMG acquired from Univision in acquiring the station as a business.

20.     By about April 2025, the relationship between Mr. Liberman and myself became strained, for multiple reasons.  Among other issues between us, Mr. Liberman expressed to me that he did not like how I was handling sales.  For my part, I disagreed with

7

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

Mr. Liberman's decision-making for LMG as to the Univision relationship – I believed Mr. Liberman was antagonizing Univision in a way that seemed both unnecessary and imprudent, including by Mr. Liberman doing such things as causing LMG to refuse to pay contractual network affiliation charges which Univision claimed were owed. I also disagreed with Mr. Liberman causing LMG to refuse to pay rent in the amounts which LMG's new landlord (Hemisphere, who took over the lease to the city-owned building from Univision in about 2023) claimed were owing.

21.    By no later than about April 2025, Mr. Liberman had largely if not entirely stripped me of my duties and powers as COO, effectively transferring those duties and powers to himself, and to a Chief Financial Officer ("CFO") for LMG whom Mr. Liberman had caused LMG to hire in early 2025, and who reported to Mr. Liberman and not to me.

22.    By about August 2025, under the new management regime of LMG imposed by Mr. Liberman pursuant to which I had sharply reduced management authority or responsibilities, LMG had begun to suffer increasing operational and financial problems, the precise extent of which I lack complete information regarding. Among other issues, Mr. Liberman had further exacerbated the relationship between LMG and Univision, in ways it is unlikely I would have done if it were up to, or which I perhaps would have advised Mr. Liberman not to do if he had consulted me, which he did not.

23.    On or about August 25, 2025, Mr. Liberman caused LMG to send me a written notice letter that LMG was terminating my employment prior to the end of the fixed term of employment provided in the Services Agreement, and purportedly for cause. I call this

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

letter here the "August 25, 2025 Termination Notice." A true and correct copy of the August 25, 2025 Termination Notice is attached hereto as **Exhibit 3**.

24. The August 25, 2025 Termination Notice asserted that I had committed various material breach of the Services Agreement and associated misconduct toward LMG. Substantially all of these allegations were factually inaccurate and most or all of them had no basis in reality at all. I promptly responded to the August 25, 2025 Termination Notice by communicating to Mr. Liberman that the allegations in the August 25, 2025 Termination Notice were substantially false, and that it was my position that LMG had no grounds to terminate my employment for cause. I further raised and reminded Mr. Liberman of his and LMG's own improper conduct toward me, including LMG's material breaches of the Services Agreement by failing to make the full awards to me of the contingent compensation, including the full amount of "Class B" membership units to which I was entitled if LMG used proper and accurate accounting methodology for the relevant financial performance metrics. Thus, among other issues I raised to Mr. Liberman in these communications between us in the late August through into early November 2025 time frame, I made protests to Mr. Liberman and LMG that they were not paying me the full financial compensation owed to me for my rendition of COO services under the Services Agreement.

25. Between late August 2025 and through to November 6, 2025, Mr. Liberman (on behalf of LMG) and I engaged directly between the two of us in settlement negotiations for a mutually agreeable resolution of the disputes that had arisen regarding my employment with LMG. During this period, Mr. Liberman, as he disclosed to me, caused a

proposed written settlement agreement to be drafted, and Mr. Liberman then presented it to me.  Mr. Liberman and I proceeded to negotiate further directly between ourselves, without any lawyer intermediaries or other intermediaries on either side (at least not on my side), regarding the written terms and language of the written settlement agreement.

26. On November 6, 2025, on behalf of LMG, Mr. Liberman transmitted to me a proposed execution version of the settlement agreement, as the proposed final agreed settlement agreement.  Based on the communications that had occurred between Mr. Liberman and myself, including his November 6, 2025 transmission cover email to me of the proposed execution version of the settlement agreement, I understood, and I believe that Mr. Liberman as the representative for LMG also understood, that if I signed the execution version of the settlement agreement, and then did not exercise a 7-day-from signature revocation right which Mr. Liberman had caused to be included in the proposed execution version of the settlement agreement, that the settlement agreement would then be a binding written agreement between me and LMG.  I signed the execution version of the settlement agreement on November 6, 2025, and I emailed it back to Mr. Liberman with my signature the next day, November 7, 2025.  I have never communicated any revocation of the settlement agreement.

27. A true and correct copy of the proposed execution version of the settlement agreement as Mr. Liberman emailed it to me on November 6, 2025, including with his transmission cover email, is attached hereto as **Exhibit 4**.

28. A true and correct copy of the proposed execution version of the Settlement Agreement as I signed it on November 6, 2025, and as I emailed it back to Mr. Liberman on

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

November 7, 2025 (which I call herein the "Settlement Agreement," with initial capital letters), is attached hereto as **Exhibit 5** (with my November 7, 2025 return transmission cover email also included). The proposed execution version of the settlement agreement which appears in Exhibit 4 and the Settlement Agreement as I signed it on November 6, 2025 and emailed it back to Mr. Liberman on November 7, 2025 (Exhibit 5) are identical, except that the version in Exhibit 5 has my signature.

29.    Both versions include a paragraph 4f, the substance of which paragraph I specifically asked Mr. Liberman to include as a material condition to my agreeing to the Settlement Agreement, and which he specifically agreed to include and which paragraph he drafted or caused to be drafted. The paragraph reads: "Except as to any claims that cannot be released under applicable law, the Company [LMG] releases, waives, settles, compromises, and forever discharges any and all claims against Horton [me] that the Company [LMG] has as of the time of the execution of this Agreement, whether known or unknown to the Company [LMG] and whether asserted or unasserted." As I read the Complaint in this action, all of the allegations and claims LMG makes against me, are based on alleged conduct by me that occurred prior to November 6, 2025, in addition to being largely factually false and unfounded.

30.    Both versions of the settlement agreement document (Exhibits 4 and 5) also include a paragraph 10 which references the Arbitration Agreement (referenced as "Agreement to Arbitrate Disputes") that is part of the Services Agreement (Exhibit 1, the Arbitration Agreement specifically at pages 37-38 of Exhibit 1). I understand the reference in the paragraph 10 to mean that even after our mutual agreement to the Settlement

11

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

Agreement, the Arbitration Agreement continues to govern disputes between LMG and me regarding my employment with LMG as its COO.

31.     Both versions of the settlement agreement document (Exhibits 4 and 5) include a paragraph 2.c., which reads "The Parties acknowledge and agree that, as of the date of this Agreement, Horton holds a total of 3,375.20 vested Class B Units in the Company." Mr. Liberman and I specifically discussed the substance of this paragraph in our settlement agreement negotiations.  The meaning of the paragraph is that, as part of the agreed settlement, LMG agreed that I was still a Class B member of LMG, in the stated amount of units, and that for my part, I agreed to accept the stated amount of units as the measure of my Class B Units, even though my position was (and still would be, except for the Settlement Agreement) that I was entitled under the Services Agreement to a larger number of Class B Units than that, if LMG used proper and accurate accounting of the relevant financial milestones.

32.     On November 14, 2025, I received an email from the office of a lawyer with and address in Chicago, Illinois, attaching a letter dated the same day (November 14, 2025), signed by a lawyer named Keith E. Allen.  In his letter, Mr. Allen says that his firm represents LMG.  The letter is five pages long and by my understanding of it, among other things, it asserted claims against me by LMG for my alleged breach of the Services Agreement and related misconduct, for conduct occurring prior to November 6, 2025, and demanded a response from me by 5:00 p.m. Central Standard Time on December 1, 2025.  A true and correct copy of this November 14, 2025 communication to me (including the cover email) is attached hereto as **Exhibit 6**.

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

33.     After I received Exhibit 6, I engaged a litigation attorney (Edward Anderson of Anderson Yeh PC in Pasadena, California) to represent me regarding the Exhibit 6 letter and related issues.

34.     No one has ever communicated to me on behalf of LMG (or anyone else) that I am no longer a Class B member of LMG, and as far as I know, I still am, and I was as of March 3, 2026, at the time of LMG's filing of the Complaint in this action.

35.     To the best of my knowledge and understanding, I have performed all of my obligations under the Settlement Agreement, and that has consistently been my intention since I signed the Settlement Agreement on November 6, 2025.  Among other performances owed to me by LMG under the Settlement Agreement, LMG has failed to pay $60,000 of an agreed $120,000 cash settlement payment to me, which $60,000 was to be paid to me by no later than December 31, 2025.  No one for LMG has ever communicated to me any reason for the non-payment.

36.     I generally disagree with and deny and contest the allegations in the Complaint, especially its overall thrust.  The story the Complaint tells is substantially factually false, and is highly defamatory and disparaging of me, and indeed I believe that was Mr. Liberman's primary purpose in causing it to be publicly filed.  I deny that I committed any acts or omissions during my tenure as COO of LMG that would constitute any gross or extreme level of negligence.  I deny that I have ever committed any willful misconduct toward LMG, nor would I have any incentive to do so where I still have a significant financial interest in LMG as a Class B Member.  I deny that I have ever committed any act of financial malfeasance toward LMG, and I certainly have never intentionally done

13

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

so.  I deny that the Amended LLC Agreement is the primary document governing my relationship to LMG as its COO or former COO, and I respectfully submit that the documents which primarily governs that aspect of my relationship with LMG are the Services Agreement including the Arbitration Agreement in it, as modified by the Settlement Agreement (which by my understanding preserves and maintains the Arbitration Agreement).  Excepting my act of pursuing arbitration to enforce my rights against LMG, I deny that any act or omission by me has ever damaged LMG in any substantial amount of money, and certainly never in the amount of "millions of dollars."

37.     With respect to which agreement or agreements govern my actual or alleged conduct as LMG's COO, I have the following specific disagreements with the allegations in the Complaint:

a.      Paragraph 9 of the Complaint says that "[t]he Amended LLC Agreement established, *inter alia*, the members' rights and responsibilities and governed their relationships with respect to LMG."  This paragraph is incorrect or at least incomplete or misleading.  The Amended LLC Agreement governed my relationship with LMG as a "Class B" member of LMG, but my relationship with LMG as its COO was governed primarily by the Services Agreement, or at the very least was subject to the Services Agreement, including the Arbitration Agreement that is part of it.  Indeed, the Amended LLC Agreement itself says that "[t]he officers [of LMG] will serve at the pleasure of the Manager, subject to any rights of such officers under any employment contract,"  (Exhibit 2 at page 25, paragraph 5.2.1), and also says that "[a]ny resignation or removal [of an officer of LMG] is without prejudice to the

14

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

rights, if any, of the parties under any contract to which the officer is a party." (Id. at paragraph 5.2.2.)   By my understanding, the Services Agreement is an "employment contract" within the meaning of Exhibit 2, paragraph 5.2.1, and it is also a "contract to which the officer [me] is a party" within the meaning of Exhibit 2, paragraph 5.2.2.

b.      Paragraph 12 of the Complaint says that "[p]ursuant to the Amended LLC Agreement ... Horton [me] served as its COO."  This paragraph is incorrect or at least incomplete or misleading for substantially the same reasons as paragraph 9 of the Complaint discussed above: my service to LMG as its COO was primarily governed by, or at the very least was subject to, the Services Agreement, including the Arbitration Agreement that is part of it.

c.      Paragraph 16 of the Complaint alleges that "[b]y virtue of [my] position [which I submit fairly interpreted means, my position as COO of LMG], and the acts and omissions described herein [which I again submit fairly interpreted means, my acts and omissions as COO of LMG], [I] am liable to LMG pursuant to Section 6.1.2 of the Amended LLC Agreement."  This allegation of the Complaint is again not accurate or misleading, in that, as shown on page 28 of Exhibit 2, Section 6.1.2 of the Amended LLC Agreement is actually an exculpatory clause that sets forth what types of conduct for which LMG's officers are not liable to LMG: in other words, that clause was intended to provide me and other officers of LMG with incentive to accept appointment to perform as LMG officers, by limiting our potential liability, not by

15

itself creating any liability – it is an additional right in my favor as an officer of LMG, in addition to my rights against LMG as COO under the Services Agreement.

d.      Paragraph 18 of the Complaint quotes a portion of Section 6.1.2 of the Amended LLC Agreement, and is again at least misleading for substantially the same reasons as paragraph 16 of the Complaint, as discussed above.

e.      Paragraph 31 of the Complaint says "[t]he Parties [LMG and I] voluntarily entered into the Amended LLC Agreement to establish their respective rights and responsibilities and to govern their relationship with respect to LMG."  This statement is inaccurate or at least misleading, for substantially the same reasons as paragraphs 9 and 12 of the Complaint, discussed above: the relationship relevant to the Complaint is the COO relationship, and that was primarily governed by, or at the very least subject to, the Services Agreement, including the Arbitration Agreement in it.

f.      Paragraph 33 of the Complaint says "[t]he Amended LLC Agreement imposes liability upon officers who engage in gross negligence in the performance of their duties."  I disagree with that statement for substantially the same reasons I discuss above with respect to paragraph 16 of the Complaint: at least as far as any sections of the Amended LLC Agreement actually referenced in the Complaint, none of them impose liability upon officers, but rather instead are exculpatory clauses in favor of the officers, and the officers also have the rights in their employment or other contracts with LMG.  For me, that means the rights in the Services Agreement, including the Arbitration Agreement in it.

g.    Paragraph 34 of the Complaint says "[I] breached the Amended LLC Agreement by violating the Standard of Care clause set forth in Section 6.1.2 through [my] gross negligence in performing [my] duties as COO."  This paragraph is inaccurate or at least misleading in multiple respects.  First, it is inaccurate or at least misleading for substantially the same reasons as discussed above in connection with paragraph 33 of the Complaint: the referenced section of the Amended LLC Agreement is an exculpatory clause in my favor, not a clause itself establishing any liability, and, in any event, as COO I also had the rights in the Services Agreement,

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

including the Arbitration Agreement in it. Second, paragraph 34 is inaccurate in its accusation that I committed gross negligence. I did not.

I declare under penalty of perjury under the laws of the United States of America, the laws of the Commonwealth of Puerto Rico, the laws of the State of Rhode Island, and the laws of the State of California, that the foregoing is true and correct and that this declaration is executed on March 19, 2026 in Los Angeles, California.

_____

Winter Horton

**RESPECTFULLY SUBMITTED**.

**I HEREBY CERTIFY** that on this same date a copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to the attorneys of record.

In San Juan Puerto Rico, this 19th day of March 2026.

**VICENTE LAW OFFICE LLC**
P.O. Box 11609
San Juan, P.R. 00910-1609
Phone    (787) 751-8000
Facsimile (787) 756-5250

**Harold D. Vicente-Colón**
USDC-PR  211805
E-Mail:  hdvc@vclawpr.com

**ANDERSON YEH PC**
1055 E. Colorado Blvd., Ste 500
Pasadena, CA 91106
Phone    (626) 204-4092
Facsimile (888) 744-0317

Declaration of Winter Horton in Support of Defendant's Motion to Compel Arbitration and Stay Action, or in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction
Civil No. 26-1125-SCC

**Edward M. Anderson**
(*Pro Hac Vice Application Pending*)
E-Mail:  *edward@andersonyehlaw.com*

19